UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| LUIS OLAGE,<br><br>Plaintiff,<br><br>vs.<br><br>KELLIE WASKO, Secretary at Department of Corrections in individual and official capacity; ALEX REYES, Warden at Mike Durfee State Prison in individual and official capacity; DEB EILERS, Unit Captain at Mike Durfee State Prison in individual and official capacity; TAMMY DOYLE, Corrections Specialist at Mike Durfee State Prison in individual and official capacity; CORY NELSON, Behavioral Health Coordinator at Mike Durfee State Prison in individual and official capacity; JOE CARDA, Mental Health Counselor at Mike Durfee State Prison, in individual and official capacity; JEFFREY NIXON, Associate Warden at Mike Durfee State Prison in individual and official capacity; C.O. MEYERS, Correctional Officer at Mike Durfee State Prison in individual and official capacity; CORPORAL FUNK, Corporal at Mike Durfee State Prison in individual and official capacity; AMBER PIRRAGLIA, Director of Prisons at South Dakota Department of Corrections in individual and official capacity; and DAN SASTAK, Unit Captain at Mike Durfee State Prison in individual and official capacity,<br><br>Defendants. | 4:24-CV-04135-RAL<br><br>OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Plaintiff Luis Olage, an inmate at Mike Durfee State Prison (MDSP), filed a pro se lawsuit under 42 U.S.C. § 1983. Doc. 1. The Court granted Olage's motion for leave to proceed in forma pauperis and screened Olage's amended complaint, Doc. 15, in accordance with 28 U.S.C.

§ 1915A. Doc. 21. After screening, this Court dismissed in part and directed service in part of Olage's amended complaint. Id. at 41–45. Defendants now move for summary judgment. Doc. 52. For the reasons discussed below, Defendants' motion for summary judgment is granted.

## I. Procedural History and Remaining Claims

Five claims in Olage's amended complaint survived screening. See generally Docs. 15, 21. Because of the number of claims and Defendants, this Court begins with a summary of Olage's pending claims:

- First Amendment retaliation claim against Eilers, Sastak,[1] Reyes, Nixon, Meyers, and Funk in their individual capacities for money damages and their official capacities for injunctive and declaratory relief. Doc. 21 at 23–24, 43.
- First Amendment right to send and receive mail and right to petition the government claims against Eilers, Doyle, and Reyes in their individual capacities for money damages and official capacities for injunctive and declaratory relief. Id. at 24–25, 43.
- Eighth Amendment deliberate indifference to serious medical needs claims related to knee and foot complications against Wasko, Reyes, Eilers, and Doyle in their individual capacities for money damages and official capacities for injunctive relief. Id. at 25–27, 43.
- Eighth Amendment deliberate indifference to serious medical needs claims related to mental health against Eilers, Nelson, Nixon, Reyes, Wasko, Pirraglia, Doyle, and Carda in their individual capacities for money damages and official capacities for injunctive and declaratory relief. Id. at 27, 43; Doc. 38 at 3.

[1] Based on other cases that this Court has handled, the Court is aware that the correct spelling of this Defendant's last name is Sestak. See also Doc. 54-1 at 79. This Opinion and Order hereafter will use the correct spelling of this Defendant's last name.

- Fourteenth Amendment equal protection claim against Wasko, Reyes, and Eilers in their individual capacities for money damages and their official capacities for injunctive and declaratory relief. Doc. 21 at 30–32, 43.

Olage filed an "objection" to Defendants' motion for summary judgment on the grounds that Defendants did not respond to discovery requests Olage had served on November 26, 2025, and December 2, 2025. Doc. 57. Because of Defendants' alleged failure to participate in the discovery process, Olage moved to strike Defendants' motion for summary judgment. Id. ¶ 7. The Rule 16 Scheduling Order in this case had required that all discovery must be commenced in time to be completed by December 1, 2025. Doc. 36. Defendants argued that Olage's discovery requests were untimely and that they, therefore, properly declined to respond. Doc. 58 at 2–5. This Court denied Olage's motion to strike Defendants' motion for summary judgment because Olage offered no reason why he could not have timely served the discovery requests identified in his motion to strike or, alternatively, moved to extend the discovery deadline. Doc. 62 at 2–3. Olage also failed to explain how responses to his discovery requests would have presented essential facts necessary to oppose Defendants' motion for summary judgment. Id. at 3.

While denying Olage's motion to strike, this Court extended Olage's time to respond to Defendants' motion for summary judgment and notified Olage that he should also respond to Defendants' statement of undisputed material facts, Doc. 54. Doc. 62 at 3–5. The order informed Olage that his response to Defendants' statement of undisputed material facts must comply with D.S.D. Civ. LR 56.1 and directed the Clerk of Court to provide Olage a copy of D.S.D. Civ. LR 56.1. Id. at 4–5. Subsequently, this Court granted two further extensions of time to Olage to respond to Defendants' motion for summary judgment. Doc. 67 at 4; Doc. 72 at 2.

Olage submitted a brief in opposition to Defendants' motion for summary judgment, Doc. 74; a "motion" to oppose Defendants' summary judgment, Doc. 73, which is more appropriately construed as an additional brief in opposition to Defendants' motion for summary judgment; and a response to Defendants' statement of undisputed material facts, Doc. 75. Olage's response to Defendants' statement of undisputed material facts, Doc. 75, disputes many of the numbered paragraphs in Defendants' statement of undisputed material facts, but Olage does not include "appropriate citations to record[,]" as required by D.S.D. Civ. LR 56.1(B) and Fed. R. Civ. P. 56(c)(1). However, Olage's response is signed under penalty of perjury in accordance with 28 U.S.C. § 1746. See Doc. 75 at 9. Thus, to the extent Olage's statements explaining why he disputes certain paragraphs in Defendants' statement of undisputed material facts comply with Fed. R. Civ. P. 56(c)(4), this Court will liberally construe these portions of Olage's response as an affidavit. See Lamar v. Payne, 111 F.4th 902, 907 n.2 (8th Cir. 2024) (recognizing that pro se filings should be liberally construed).

## II. Facts[2]

### A. The Parties

Olage is in the custody of the South Dakota Department of Corrections (DOC) and is currently incarcerated at MDSP in Springfield, South Dakota. Doc. 54 ¶ 1; Doc. 75 ¶ 1. Kellie Wasko, at all relevant times,[3] was the Secretary of the Department of Corrections. Doc. 54 ¶ 2;

---

[2] This Court takes the facts primarily from those portions of Defendants' statement of material facts Olage does not dispute, but for the portions Olage properly disputes, this Court cites to both parties' versions and is mindful that genuine disputes of material fact are resolved at the summary judgment stage in Olage's favor.

[3] Wasko is no longer the Secretary of the Department of Corrections. However, because none of Olage's official capacity claims survive summary judgment, it would be futile to substitute Wasko's successor on the official capacity claims. See Fed. R. Civ. P. 25(d). The same is true for the official capacity claims against C.O. Meyers and Amber Pirraglia.

Doc. 75 ¶ 2. Alex Reyes is the Warden of MDSP. Doc. 54 ¶ 3; Doc. 75 ¶ 3. Deb Eilers is employed by the DOC as a unit captain at MDSP. Doc. 54 ¶ 4; Doc. 75 ¶ 4. Tammy Doyle is employed by the DOC as a corrections specialist at MDSP. Doc. 54 ¶ 5; Doc. 75 ¶ 5. Cory Nelson is employed by the DOC as a behavioral health coordinator at MDSP. Doc. 54 ¶ 6; Doc. 75 ¶ 6. Joe Carda is employed by the DOC as a mental health counselor at MDSP. Doc. 54 ¶ 7; Doc. 75 ¶ 7. Jeffrey Nixon is an associate Warden at MDSP. Doc. 54 ¶ 8; Doc. 75 ¶ 8. At all relevant times, Meyers was employed as a correctional officer at MDSP. Doc. 54 ¶ 9; Doc. 75 ¶ 9. Funk is a corporal at MDSP. Doc. 54 ¶ 10; Doc. 75 ¶ 10. Amber Pirraglia was employed by the DOC as Director of Prisons. Doc. 54 ¶ 11; Doc. 75 ¶ 11. Dan Sestak is a unit captain at MDSP. Doc. 54 ¶ 12; Doc. 75 ¶ 12.

**B. Retaliation**

On July 31, 2024, Olage contends that Eilers called him into her office regarding five kites Olage had submitted requesting grievance forms. Doc. 54-1 at 80. According to Olage, Eilers "retaliated against [him] with adverse action" by messaging Captain Sestak to come to her office to intimidate Olage. Id.; Doc. 54 ¶ 17; Doc. 75 ¶ 17. Olage was attempting to submit grievances regarding a change in his mental health medication. Doc. 15 at 18. Olage also alleges that Eilers said, "I don't know if you really have any grief or concern because these kites do not have your handwriting on them." Doc. 54-1 at 80. Olage contends that Eilers was attempting to deter him from submitting grievances and exhausting his administrative remedies. Id.

Warden Reyes responded to Olage's grievance regarding Eilers. Id. at 79. According to Reyes's response, Eilers provided the forms that Olage had requested and the DOC's records indicated that Olage had submitted several grievances that had been processed according to policy. Id. Olage does not dispute that Eilers provided the grievance forms he had requested, although he

does contend that Eilers "did not give [him] legal means necessary to send out legal mail." Doc. 75 ¶ 16; see also Doc. 54 ¶ 16. Reyes's response also indicated that Sestak's presence in Eilers' officer had nothing to do with Olage. Doc. 54 ¶ 19; Doc. 54-1 at 79. Olage disputes that Sestak's presence was unrelated to him and asserts that "Saestaks [sic] presence was to intimidate." Doc. 75 ¶ 19.

### C. Mail Issues

Olage claims that he was prevented from sending legal mail to then-President Biden seeking a pardon. Doc. 54 ¶ 49; Doc. 75 ¶ 49. Because the letter to President Biden was not mailed, Olage wrote "Attorney General Garland" on the envelope and sent the same letter that he was going to send to President Biden to then-Attorney General Merrick Garland. Doc. 54 ¶ 50; Doc. 75 ¶ 50. According to Olage's deposition testimony, the purpose of the letter was to inform President Biden what is going on in the South Dakota prison system. Doc. 54 ¶ 51; Doc. 54-2 at 47–48; Doc. 75 ¶ 51.

### D. Foot Issues

On December 7, 2023, Olage was evaluated by a nurse during sick call for joint pain in his right foot and ankle area. Doc. 54 ¶ 67; Doc. 54-3 at 244–45; Doc. 75 ¶ 67. After the evaluation, an appointment with a provider was scheduled. Doc. 54-3 at 248. During the provider appointment on December 13, 2023, Olage presented with a painful bunion on his right foot. Doc. 54 ¶ 68; Doc. 54-3 at 254; Doc. 75 ¶ 68. Olage was wearing tennis shoes that were in good repair but his right shoe was bulging at the site of his bunion. Doc. 54-3 at 254. Olage stated that he would like medical shoes and possibly surgery if it could be performed without "going under." Id. at 254–55. The provider, who is not a named defendant, noted that Olage does not meet the criteria for medical shoes but documented that he had "emailed the CD requesting special consideration

for the shoes and await[s] his recommendation." Id. at 255. The provider also recommended a referral to podiatry for further evaluation of the bunion. Id. Olage disputes that he did not meet the criteria for medical shoes, Doc. 75 ¶ 69, but he does not cite to any record evidence to support his assertion.

Dr. Haynes, the medical director who is not a named defendant, approved the request for podiatry referral, and Olage was scheduled to see an outside podiatrist. Doc. 54 ¶ 70; Doc. 54-3 at 265; Doc. 75 ¶ 70. On January 31, 2024, Olage was notified that he had been scheduled to see a podiatrist. Doc. 54-3 at 303. Olage saw an outside podiatrist on March 1, 2024. Doc. 54 ¶ 72; Doc. 54-3 at 322; Doc. 75 ¶ 72.

On March 6, 2024, Olage saw a provider at MDSP and reported that the outside podiatrist had recommended New Balance shoes and provided him with shoe inserts. Doc. 54 ¶ 74; Doc. 54-3 at 327; Doc. 75 ¶ 74. The provider's plan was to "[a]wait the Podiatrist's consult recommendations[.]" Doc. 54-3 at 328. Shortly after this appointment, Olage questioned whether an order had been received for New Balance shoes, and a provider reviewed his chart. Doc. 54-3 at 337. The provider submitted a non-formulary request for New Balance shoes. Doc. 54 ¶ 76; Doc. 54-3 at 337; Doc. 75 ¶ 76. Dr. Haynes rejected the non-formulary request for New Balance shoes and indicated that the shoes could be purchased from the commissary. Doc. 54-3 at 335.

On March 20, 2024, Olage submitted an informal resolution request seeking New Balance shoes that the outside podiatrist had recommended. Doc. 54-1 at 43. In response to his informal resolution request Olage was advised that

> [Y]our chart has been reviewed. Medical is unable to purchase New Balance shoes. There is a medical shoe available but it requires Nonform approval through medical which you do not have at this time. Any recommendations received from outside providers are recommendations, not orders. You are encouraged to kite medical for nurse sick call assessment with any new or worsening symptoms.

Doc. 54-1 at 42; see also Doc. 54 ¶¶ 77, 78; Doc. 75 ¶¶ 77, 78.

During a nursing sick call assessment on April 11, 2024, Olage was "very animated and was adamant that he was told by S Baker that once he went out to see Podiatry that he was to KITE after 30 days to remind Provider Baker about it and that Provider would give him medical shoes New Balance." Doc. 54-3 at 359; see also Doc. 54 ¶ 79; Doc. 75 ¶ 79. After this nursing sick call assessment, Baker reviewed Olage's chart and documented that he has "promised no inmate Medical Shoes and [he] do[esn't] make promises to inmates. [He] was just informed Medical can not buy New Balance shoes but they are available in commissary." Doc. 54-3 at 363; see also Doc. 54 ¶ 81. Olage, however, contends that "provider Baker did say he would provide medical shoes." Doc. 75 ¶ 81. On April 11, 2024, Baker also noted that the outside podiatrist had provided Olage with a Power STEP insole on March 1, 2024. Doc. 54 ¶ 80; Doc. 54-3 at 362; Doc. 75 ¶ 80. Following Baker's chart review, Olage was notified by correspondence dated April 11, 2024, that "[m]edical cannot buy New Balance shoes; these can be purchased from commissary." Doc. 54-3 at 365.

Olage submitted a kite dated July 15, 2024, requesting the "medical shoes that [had] been approved[]" and stating that his feet hurt. Doc. 54-3 at 460; see also Doc. 54 ¶ 84; Doc. 75 ¶ 84. In response, Olage was again informed that his request for New Balance shoes had been rejected and that he could purchase the shoes from commissary. Doc. 54-3 at 458; see also Doc. 54 ¶ 84; Doc. 75 ¶ 84. At the end of July 2024, Olage submitted an administrative remedy request regarding New Balance shoes and was informed that New Balance shoes are not the brand provided as medical shoes, but that there is a medical shoe available. Doc. 54-3 at 498. Olage was instructed to kite for a nurse sick call to discuss whether he qualifies for the standard medical shoe. Id.

On August 7, 2024, Olage submitted a kite requesting to be seen by health services for foot pain. Doc. 54-3 at 544. He also sent a kite to Warden Reyes on the same day related to foot pain and requesting that Reyes contact health services "to make sure [he's] not inflicted by medical malpractice." Doc. 54 ¶ 88; Doc. 54-3 at 547; Doc. 75 ¶ 88. The next day, August 9, 2024, a nurse responded to the kite directed to Warden Reyes. Doc. 54-3 at 555. According to the response, Olage's chart "ha[d] been reviewed. Health services does not provide New Balance shoes. Medical does have the ability to order a black medical shoe, which you have not qualified for per policy standards. If you wish to request medical shoes you are encouraged to kite health services for nurse sick call." Id.; see also Doc. 54 ¶ 89; Doc. 75 ¶ 89; Doc. 54-3 at 568 (informing Olage that he does not meet the criteria for medical shoes because his medical records do not demonstrate any signs or symptoms of deformities or disease that qualify for a medical shoe).

On August 8, 2024, the day after Olage submitted a kite requesting to be seen for foot pain, a sick call order was placed and Olage was notified by correspondence that he was scheduled to be seen for foot pain. Doc. 54-3 at 577. However, on August 15, 2024, when Olage was due for his nurse sick call, he did not show. Id.; Doc. 54 ¶ 91. Olage contends that no prison officials summoned him for sick call. Doc. 75 ¶ 91. Regardless, on August 24, 2024, Olage was evaluated by a nurse during sick call and renewed his request for an order for medical shoes. Doc. 54-3 at 602–04. After the sick call assessment, the nurse requested a provider chart review. Id. After completing the chart review, the provider noted that Olage "does not qualify for medical shoes as he is not diabetic." Id. at 606–07. The provider recommended that Olage purchase New Balance shoes from commissary. Id. at 606. Olage was advised of the provider's recommendation by correspondence dated August 26, 2024. Id. at 616.

On September 4, 2024, Olage underwent a state-mandated physical examination. Doc. 54-3 at 658–60. During the examination, Olage reported that he works out daily, but did not report any foot pain, complications, or difficulty walking. Id. On September 11, 2024, Olage submitted an informal remedy request to Sargeant Knox requesting an order for medical shoes. Doc. 54-3 at 700; Doc. 54 ¶ 95; Doc. 75 ¶ 95. In response, Olage was again informed that he does not meet the criteria for medical shoes and reminded that a provider had recommended that he purchase New Balance shoes from the commissary. Id. Olage believes that he meets the criteria for medical shoes because of his foot pain, but this is simply Olage's personal opinion; he does not cite to anything establishing that inmates with foot pain who are not diabetic qualify for medical shoes. Doc. 54 ¶ 96; Doc. 75 ¶ 96.

**E. Knee Pain**

During a visit with a nurse on May 20, 2024, Olage reported left knee pain that had started on the previous day, but he also stated that he was still trying to exercise with his injury. Doc. 54 ¶ 110; Doc. 54-3 at 401-02; Doc. 75 ¶ 110. According to the record of this encounter, no swelling was noted and Olage did not appear to be in distress. Doc. 54 ¶ 111; Doc. 54-3 at 402. Olage was directed to apply ice four times a day for pain for 48 hours. Id. Olage contends that he was given an ice order for 24, not 48 hours. Doc. 75 ¶ 111. He also contends that swelling was present at the time of his May 20, 2024 visit, but the nurse failed to document the swelling or to complete a full check-up. Doc. 15 at 9.

On June 5, 2024, Olage submitted a kite requesting to be seen for his knee and questioning whether he may have torn his ACL. Doc. 54 ¶ 115; Doc. 54-3 at 408; Doc. 75 ¶ 115. The next day, June 6, 2024, Olage was seen for sick call and reported to the nurse that he "work[s] out like crazy everyday[.]" Doc. 54 ¶ 119; Doc. 54-3 at 413; Doc. 75 ¶ 119. According to the record, Olage

"continues to tell this nurse how bad his injury is yet how he cant [sic] stop working out." Doc. 54-3 at 413. Olage rated his pain at 10/10. Id. Olage reported that he had been using someone else's knee brace and requested his own knee brace. Id. The nurse requested that a provider review Olage's chart and recommended ice four times a day for 48 hours. Id. at 414. A provider reviewed Olage's chart on June 6, 2024, and ordered a left knee x-ray, physical therapy, and a green theraband. Doc. 54 ¶¶ 121, 122; Doc. 54-3 at 417; Doc. 5 ¶¶ 121, 122. According to the provider's note, she declined to order a knee brace at this point, but indicated that it may be considered in the future. Doc. 54 ¶ 122; Doc. 54-3 at 417; Doc. 75 ¶ 122. The provider also directed that Olage "[t]ake it easy with working out[]" and warned that his condition will only get worse if he continues to work out with knee pain. Doc. 54-3 at 417. Because Olage said that he was not interested in taking Tylenol, the provider stated that he could purchase Ibuprofen from the commissary. Doc. Doc. 54 ¶ 121; Doc. 54-3 at 417; Doc. 75 ¶ 121. Finally, the provider noted that an MRI could be a consideration in the future after completion of physical therapy. Doc. 54 ¶ 122; Doc. 54-3 at 417; Doc. 75 ¶ 122.

An x-ray of Olage's left knee was performed on June 12, 2024. Doc. 54-3 at 429. The x-ray showed a small to moderate suprapatellar knee effusion, but no acute fracture or dislocation. Id. Joint spaces were preserved. Id. After reviewing the x-ray report, a provider documented that the x-ray reveals swelling, but no other changes. Id. at 428. The provider ordered a knee brace and instructed Olage to use RICE (rest, ice, compression, and elevation) therapy for the next few weeks and to kite for sick call if his knee did not improve. Id. at 428, 432. Olage contends that he was experiencing unbearable pain and that the medical staff made him wait another two weeks before being seen. Doc. 75 ¶ 128. The green theraband was issued on June 18, 2024. Doc. 54 ¶ 125; Doc. 54-3 at 441; Doc. 75 ¶ 125.

On June 18, 2024, a nurse reviewed Olage's chart to respond to his Informal Resolution Request. Doc. 54-3 at 433. The nurse responded:

> You were seen for nurse sick call on 5/20/24 with reports of left knee pain. At that visit you reported continuing exercising despite your reported pain. At this visit there was no noted swelling or deformity to the left knee. You were assessed and educated to ice the knee. You returned to sick call on 6/6/24 with reports of continued pain not relieved with Ice and rest. At your 6/6/24 visit you reported continuing to work out and worsening pain. You were educated to stop working out, encouraged to ice and provider chart review was placed. An order for Xray was placed and completed and you were sent the following correspondence from Provider chart review: "Left knee xray ordered. Purchase ibuprofen from commissary since not interested in tylenol. Take it easy with working out. Sometimes your body just simply needs rest. It will only get worse if you continue to work out with your knee pain. Even a couple days may do wonders for you. Can do other exercises such as abs for example. Physical Therapy ordered. Will order him a green theraband to start with. No brace yet but may consider in the future. MRI will be another consideration in the future once PT is done. . . . Ice, rest, elevate knee." Your request for $3 refund, MRI, and Knee brace are denied at this time. You are encouraged to follow the current plan of care and kite health services with any new or worsening symptoms.

Id.

Olage was scheduled for initial physical therapy evaluation on July 25, 2024. Doc. 54 ¶ 131; Doc. 54-3 at 467. Olage asserts that he was never made aware that he had been scheduled for a physical therapy evaluation, Doc. 75 ¶ 131, but his medical records indicate that he was in fact notified, Doc. 54-3 at 471. Further, Olage testified in his deposition that he was sent to physical therapy. Doc. 54-2 at 49–50. On August 26, 2024, an MRI was ordered because Olage's left knee pain had not improved with physical therapy, and the therapist recommended further evaluation. Doc. 54 ¶ 133; Doc. 54-3 at 611; Doc. 75 ¶ 133.

An MRI with claustrophobic medication precautions for Olage's left knee was scheduled with an outsider provider for October 3, 2024. Doc. 54 ¶ 135; Doc. 54-3 at 720; Doc. 75 ¶ 135. A provider ordered Lorazapam prior to the MRI because of Olage's claustrophobia. Doc. 54 ¶ 136; Doc. 54-3 at 736, 738; Doc. 75 ¶ 136. Olage was notified that medication had been ordered for

his claustrophobia. Doc. 54-3 at 740. On the date that the MRI was scheduled, Olage refused the Lorazepam and refused the outside MRI appointment. Doc. 54 ¶ 137; Doc. 54-3 at 749, 750; Doc. 75 ¶ 137. When Olage refused to undergo the October 3, 2024, MRI, he executed a release of responsibility. Doc. 54 ¶ 138; Doc. 54-3 at 760; Doc. 75 ¶ 138.

On November 6, 2024, Olage submitted a kite requesting pain management for his knee and stating that he had been waiting three months for an MRI and having issues for the last six months. Doc. 54-3 at 810. On November 8, 2024, when Olage was seen during sick call he reported that he was still having left knee pain that interrupts his sleep. Doc. 54 ¶ 139; Doc. 54-3 at 819; Doc. 75 ¶ 139. He requested an MRI with medication for anxiety and stated that he refused the last MRI because medical had not ordered Ativan before the MRI. Id. After the sick call encounter, a provider reviewed Olage's chart, and Olage was notified that an MRI is pending. Doc. 54-3 at 832. An MRI was scheduled for December 3, 2024, on Olage's left knee along with a pre-MRI x-ray. Doc. 54 ¶ 140; Doc. 75 ¶ 140. Olage was prescribed Lorazepam before the December 3, 2024, MRI. Doc. 54 ¶ 141; Doc. 54-3 at 882; Doc. 75 ¶ 141.

On November 26, 2024, Olage underwent an x-ray, and the x-ray did not reveal any joint effusion or acute bony abnormality. Doc. 54 ¶ 142; Doc. 54-3 at 895. Olage contends that his left knee did not feel normal at the time of the x-ray. Doc. 75 ¶ 142. Olage underwent an MRI at Avera Sacred Heart Hospital on December 3, 2024. Doc. 54-3 at 910. On January 9, 2025, Olage met with a provider to discuss the results of his MRI. Doc. 54 ¶ 148; Doc. 54-3 at 965. During this appointment, Olage requested Effexor for pain management. Doc. 54 ¶ 148; Doc. 54-3 at 965. The provider recommended a referral to orthopedics for further assessment and treatment options, but Olage declined this recommendation. Doc. 54-3 at 965.

Olage received a knee brace to assist with compression. Doc. 54 ¶ 153; Doc. 54-3 at 958, 965. Olage does not dispute that he was provided a knee brace on January 9, 2025, but contends that a delay of eight to nine months after his first requested a knee brace shows "neglect." Doc. 75 ¶ 153. Olage was told that Tylenol and Motrin are available through the commissary and that conservative initial pain management measures are required before considering alternative treatments. Doc. 54-3 at 949, 965. Although he could afford it, Olage testified that he did not purchase Tylenol or Ibuprofen because he did not believe that they would have alleviated his pain. Doc. 54 ¶ 150. Olage contends that Tylenol or Ibuprofen would not "alleviate a torn meniscus, way to[o] painful." Doc. 75 ¶ 151. Thus, Olage's request for Effexor for pain management was denied because he had refused to first try other conservative treatment options. Doc. 54-3 at 962, 965.

**F. Mental Health Needs**

According to Olage's amended complaint, he began taking 400 mg of Wellbutrin, which he describes as a psychotropic medication, each morning in February 2016. Doc. 15 at 15; Doc. 54 ¶ 154; Doc. 75 ¶ 154. Olage contends that this plan formulated by former MDSP Warden Troy Ponto, Jessica Cook, and a mental health review board continued unchanged for eight years. Doc. 15 at 15. On July 26, 2024, a mental health provider changed Olage's Wellbutrin prescription from one 400 mg dose each day to two 200 mg doses per day because it is not recommended to take 400 mg all at once. Doc. 54 ¶ 156; Doc. 54-3 at 477–78; Doc. 75 ¶ 156. By correspondence dated July 26, 2024, Olage was notified that his "Wellbutrin has been changed to twice a day. Once at breakfast and once at supper. It is not recommended to get 400mg at once." Doc. 54-3 at 481.

On July 27, 2024, Olage submitted a kite to medical health services stating he had "concerning issues with health services rediagnosing [his] mental health psychotropic medications without a psychologist doctor's orders." Doc. 54-3 at 487. Olage described the medication change as "deliberate differen[ce] to [his] serious medical needs[]" and labeled it as a "serious Eighth Amendment violation[.]" Doc. 54 ¶ 158; Doc. 54-3 at 487–88; Doc. 75 ¶ 158. In response to his kite, Olage was notified that only a mental health provider can change his mental health medications. Doc. 54 ¶ 158; Doc. 54-3 at 502; Doc. 75 ¶ 158; see also Doc. 54-1 at 64 ("Medical can not diagnose or make changes. We simply assess the patient, educate on medications and the MH [Mental Health] provider makes recommendations or changes, not Health Services.").

On August 14, 2024, Warden Reyes responded to Olage's request for Administrative Remedy regarding medications and stated that "[t]he Health Services Administrator was contacted and reviewed your records. She stated that all mental health medication changes are completed by the Mental Health Provider." Doc. 54-1 at 67.

On May 17, 2025, Olage was taken to the medical unit because of "potential substance use within the past five days." Doc. 54-3 at 1046; see also Doc. 54 ¶ 34; Doc. 75 ¶ 34. A few days later, on May 20, 2025, Olage's Wellbutrin was discontinued due to diversion and concerns of medication misuse. Doc. 54 ¶ 35; Doc 75 ¶ 35. After Olage's Wellbutrin was discontinued, he was seen for medication management and educated on treatment options other than Wellbutrin, but Olage was not willing to try alternative medications. Doc. 54 ¶ 38; Doc. 75 ¶ 38. Thus, Olage's request to resume Wellbutrin was denied. Id.; see also Doc. 54-3 at 1086, 1091. Olage reported that a physician at an outside facility had prescribed Wellbutrin based on a DNA test, but Olage refused to sign a release to authorize the DOC to obtain these outside records. Doc. 54 ¶ 40; Doc. 54-3 at 1089; Doc. 75 ¶ 40. In subsequent medical management encounters, Olage continued to

refuse attempts to educate him about formulary options other than Wellbutrin, remained unwilling to try any medications other than Wellbutrin, and demanded that Wellbutrin be resumed so that he would not "hurt people." Doc. 54 ¶¶ 42, 43; Doc. 54-3 at 1109, 1148; Doc. 75 ¶¶ 42, 43.[4]

Olage sees a qualified mental health provider for mental health medication management, and a qualified mental health professional for therapy. Doc. 54 ¶¶ 173, 174, 175; Doc. 75 ¶¶ 173, 174, 175 .

### G. Fourteenth Amendment Equal Protection

In his amended complaint, Olage alleges that he was intentionally treated differently than another inmate, Winston Grey Brakeall, with similar knee conditions. Doc. 15 at 13. Olage alleges that he was denied a $3.00 refund, an MRI, a knee brace, and surgery for his complaints of knee pain, but Brakeall "received all these for his knee and received a total knee replacement" while in custody of the DOC. Id. During his deposition, Olage testified that he does not know Brakeall and does not recall what Brakeall has to do with his knee complaint. Doc. 54 ¶ 198 (citing Doc. 54-2 at 87–88); Doc. 75 ¶ 198. Brakeall is mentioned in the amended complaint because an inmate assisting Olage with his amended complaint decided to use Brakeall as part of his case. Doc. 54 ¶ 198 (citing Doc. 54-2 at 87–88); Doc. 75 ¶ 198.

According to Olage's deposition testimony, he feels like all prisoners are treated differently regarding medical issues. Doc. 54 ¶ 186 (citing Doc. 54-2 at 85); Doc. 75 ¶ 186. Olage contends that he was treated differently because he had to wait two to three weeks to be seen for his knee, but he testified that "[i]t takes everybody that long[]" because there are too many inmates for a

[4] When he responded to paragraphs 42 and 43 of Defendants' statement of undisputed material facts, Olage stated that he disputed these paragraphs in part, but Olage did not cite to any record evidence. See Doc. 75 ¶¶ 42, 43. Thus, paragraphs 42 and 43 are deemed admitted. Fed. R. Civ. P. 56(c)(1); D.S.D. Civ. LR 56.1(B).

small medical center to handle. Doc. 54 ¶¶ 190, 191 (citing Doc. 54-2 at 85–86); Doc. 75 ¶¶ 190, 191. Olage contends that he should not have been charged each time he was seen for knee complaints and should receive a refund. Doc. 54-2 at 87.

Olage had an MRI performed on his knee at an outside facility. Doc. 54 ¶ 195; Doc. 54-2 at 89; Doc. 75 ¶ 195. According to Olage's deposition testimony, the MRI demonstrated a torn meniscus, and a doctor recommended that he have his knee scoped. Doc. 54 ¶ 196; Doc. 54-2 at 89; Doc. 75 ¶ 196. However, Olage did not want to have surgery until he is released from custody. Doc. 54 ¶ 196; Doc. 54-2 at 89; Doc. 75 ¶ 196. Additionally, Olage's father is his power of attorney and is the one who decides whether he has surgery. Doc. 54 ¶ 196; Doc. 54-2 at 89; Doc. 75 ¶ 196. It is undisputed that Olage received a knee sleeve, but Olage contends he did not receive the knee sleeve until months after he reported knee pain. Doc. 54 ¶ 197; Doc. 54-2 at 54; Doc. 75 ¶ 197.

## III. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials). A party opposing a properly

supported motion for summary judgment may not rest upon mere allegations or denials in his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Gacek, 666 F.3d at 1145. In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

## IV. Analysis

### A. Section 1983

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. State employees like Defendants may be sued under § 1983 in their individual capacities, their official capacities, or both. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). Here, Olage is suing Defendants in both their individual capacities for monetary damages and official capacities for injunctive and declaratory relief. See generally Doc. 15; see also Doc. 21 at 43.

The doctrine of qualified immunity is a defense available to state officials sued in their individual capacities under § 1983. This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014) (citation omitted). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. (citation omitted). A plaintiff must meet both steps to

defeat qualified immunity, and courts can begin (and perhaps end) with either step. Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015). Defendants argue that they are entitled to summary judgment on Olage's individual capacity claims because their alleged inactions or actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Doc. 53 at 22–26. But "[q]ualified immunity does not apply to a claim for injunctive relief[.]" Hamner v. Burls, 937 F.3d 1171, 1175 (8th Cir. 2019).

### B. Retaliation

Olage's First Amendment retaliation claims against Eilers, Sestak, Reyes, Nixon, Meyers and Funk in their individual capacities for money damages and their official capacities for injunctive and declaratory relief survived screening. Doc. 21 at 23–24, 43. Olage's surviving First Amendment retaliation claims relate to grievances he filed after a mental health provider changed Olage's Wellbutrin prescription from one 400 mg dose each day to two 200 mg doses per day because it is not recommended to take 400 mg all at once on or about July 25, 2024. Doc. 15 at 18. According to Olage's amended complaint, Meyers and Funk told Olage that Olage would not be getting his medication because he "attempt[ed] to grieve them for denying medication." Id.

Olage also contends that Eilers called him into her office regarding five kites Olage had submitted requesting grievance forms related to the medication change. Id.; Doc. 54-1 at 80. According to Olage, Eilers "retaliated against [him] with adverse action" by messaging Captain Sestak to come to her office to intimidate Olage. Doc. 54 ¶ 17; Doc. 54-1 at 80; Doc. 75 ¶ 17. Olage also alleges that Eilers said, "I don't know if you really have any grief or concern because these kites do not have your handwriting on them." Doc. 54-1 at 80. Olage contends that Eilers was attempting to deter him from submitting grievances and exhausting his administrative remedies. Id. According to Olage's amended complaint, "Nixon is aware of these adverse action

that these Defendants retaliated as [Olage] kited Nixon of this issue." Doc. 15 at 18. Warden Reyes responded to Olage's grievance regarding Eilers. Doc. 54-1 at 79. According to Reyes's response, Eilers provided the forms that Olage had requested and the DOC's records indicated that Olage had submitted several grievances that had been processed according to policy. Id. Olage does not dispute that Eilers provided the grievance forms he had requested, although he does contend that Eilers "did not give [him] legal means necessary to send out legal mail." Doc. 75 ¶ 16; see also Doc. 54 ¶ 16. Reyes's response also indicated that Sestak's presence in Eilers' office had nothing to do with Olage. Doc. 54 ¶ 19; Doc. 54-1 at 79. Olage disputes that Sestak's presence was unrelated to him and asserts that "Saestaks [sic] presence was to intimidate[.]" Doc. 75 ¶ 19. But Olage's bare allegation of a retaliatory motive is insufficient to create a genuine issue of material fact. Meuir v. Greene Cnty. Jail Emps. 487 F.3d 1115, 1119 (8th Cir. 2007) (citation omitted).

"[T]he First Amendment prohibits governmental officials from subjecting individuals to retaliatory actions after the fact for having to engaged in protected speech." Aldridge v. City of St. Louis, 75 F.4th 895, 899 (8th Cir. 2023) (citation modified). Filing a prison grievance is protected First Amendment activity. Gonzalez v. Bendt, 971 F.3d 742, 744–45 (8th Cir. 2020) (citation omitted). Thus, this Court will confine its analysis to whether Olage has satisfied the second and third elements of a First Amendment retaliation claim: proving that the officers took an adverse action that would chill a person of ordinary firmness from continuing in the protected activity and that the officers would not have taken the adverse action but for a retaliatory animus. Aldridge, 75 F.4th at 899; see also Beard v. Falkenrath, 97 F.4th 1109, 1119 (8th Cir. 2024). Based on the undisputed facts, Defendants are entitled to summary judgment on Olage's retaliation claim.

Olage continued to receive his Wellbutrin, albeit in two daily doses instead of one, after submitting grievances regarding the medication change in July 2024. See generally Doc. 15; Doc. 75. Although not required to so do, see Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996), this Court reviewed all the record evidence and found no evidence that Olage's Wellbutrin was discontinued or that Olage suffered any other adverse action because he grieved the medication change in August of 2024. Olage's failure to come forward with record evidence that he suffered an adverse action that would chill a person of ordinary firmness from continuing in the protected activity is fatal to his retaliation claim. The ordinary firmness test is designed to weed out trivial matters from substantial violations of the First Amendment. Santiago v. Blair, 707 F.3d 984, 992 (8th Cir. 2013). While the test is an objective one, a plaintiff's subjective actions in response to alleged relation can be evidence of what a reasonable person of ordinary firmness would have done. Id.; see also Naucke v. City of Park Hills, 284 F.3d 923, 928 (8th Cir. 2002). Here, it is undisputed that the alleged threats of retaliation did not adversely affect Olage, and it equally clear that they did not deter him from filing further grievances. See generally Doc. 54-1.

Olage's Wellbutrin was discontinued on May 20, 2025, due to diversion and concerns of medication misuse. Doc. 54 ¶ 35; Doc. 75 ¶ 35. But Olage does not cite to any record evidence that any of the Defendants named in his retaliation claim had any involvement in the decision to discontinue his Wellbutrin ten months after he grieved the medication change. However, even if one of the Defendants had been involved, it is well established that any retaliatory motive must be the but-for cause of the alleged adverse action. Aldridge, 75 F.4th at 899–90. Here, the undisputed record evidence demonstrates that the discontinuation of Olage's Wellbutrin was wholly unrelated to the grievances he filed in August 2024. Doc. 54 ¶ 35: Doc. 75 ¶ 35.

For these reasons, Eilers, Sestak, Reyes, Nixon, Meyers, and Funk are entitled to summary judgment on Olage's First Amendment retaliation claim against them in their individual capacities for money damages and their official capacities for injunctive and declaratory relief. See Falls v. Nesbitt, 966 F.2d 375, 380 (8th Cir. 1992) (recognizing that a plaintiff is not entitled to injunctive relief under § 1983 when the conduct sought to be enjoined is not a constitutional violation).

### C. First Amendment Right to Send and Receive Mail and to Petition the Government Legal Mail

This claim arises out of the alleged refusal to mail Olage's legal documents to then-President Joe Biden. Doc. 15-1 at 95–96. Defendants argue they are entitled to summary judgment on this claim because Olage has failed to fully exhaust his administrative remedies. Doc. 53 at 10. District courts must decide whether a prisoner exhausted his administrative remedies before addressing the merits of the prisoner's claims. Benjamin v. Ward Cnty., 632 F. App'x 301, 301 (8th Cir. 2016) (per curiam).

The Prison Litigation Reform Act (PLRA) requires an inmate to exhaust all available administrative remedies before bringing an action with respect to prison conditions under either § 1983 or any other federal law. 42 U.S.C. § 1997e(a); Booth v. Churner, 532 U.S. 731, 741 (2001). This mandatory exhaustion requirement applies broadly to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Jones v. Bock, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in [federal] court." (citation omitted)). The PLRA requires "immediate dismissal" of all unexhausted claims. Gibson v. Weber, 431 F.3d 339, 341 (8th Cir. 2005) (citing 42 U.S.C. § 1997e(a)). To properly exhaust administrative remedies, Olage must comply with the DOC's procedures. Woodford v. Ngo, 548 U.S. 81, 102–03 (2006)

("[P]roper exhaustion" under the PLRA requires prisoners to comply with the prison's deadlines and procedures.). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Bock, 549 U.S. at 218. "An inmate satisfies § 1997e(a) by pursuing the prison grievance process to its final stage to an adverse decision on the merits." Porter v. Sturm, 781 F.3d 448, 451 (8th Cir. 2015) (citation modified); see also Barnes v. Ark. Dep't of Corr., 485 F. App'x 151, 152 (8th Cir. 2012) (per curiam) (affirming dismissal for failure to exhaust administrative remedies when prisoner grievance appeal was denied as untimely and not decided on the merits).

The DOC's grievance procedure has two or three steps, depending on the nature of the grievance. Doc. 54 ¶¶ 54–57; Doc. 75 ¶¶ 54–57. An inmate must first try to resolve his complaint informally, either by resolving the matter verbally with staff or by submitting a Request for Informal Resolution form. Doc. 54 ¶ 54; Doc. 54-5 at 5; Doc. 75 ¶ 54. If an inmate is not satisfied with staff's response to an informal request, the inmate must proceed to the second step, which requires him to file a Request for Administrative Remedy. Doc. 54 ¶ 56; Doc. 54-5 at 6; Doc. 75 ¶ 56. A third step allows inmates to appeal to the Secretary of Corrections certain issues, but not issues concerning legal mail. Doc. 54 ¶ 57; Doc. 54-5 at 7; Doc. 75 ¶ 57.

Because failure to exhaust is an affirmative remedy, the burden to plead and prove failure to exhaust rests on Defendants. Rinaldi v. United States, 904 F.3d 257, 268 (3d Cir. 2018) (citing Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002)). Here, Defendants have met their burden. Olage submitted a kite to Eilers, which is dated August 21, 2024, reporting issues regarding legal mail addressed to President Biden seeking clemency. Doc. 54-6. But Olage did not complete the next

step of the grievance process, which required him to file a Request for Administrative Remedy.[5] Doc. 54 ¶ 58.

"[O]nce the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." Rinaldi, 904 F.3d at 268 (citing Tuckel v. Grover, 660 F.3d 1249, 1253–54 (10th Cir. 2011)). Olage "[d]ispute[s] in [p]art[]" that he did not complete step 2 of the grievance process, but he does not cite to any record evidence as required by D.S.D. Civ. LR 56.1(B) and Fed. R. Civ. P. 56(c)(1). Doc. 75 ¶ 58. However, when responding to another paragraph of Defendants' statement of undisputed facts, Olage stated that Tammy Doyle had told him that "inmates have to qualify to her standards in order to get second step grievance, preventing us inmates to Exhaust our grievance process." Doc. 75 ¶ 54.

"An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." Ross v. Blake, 578 U.S. 632, 642 (2016). The Supreme Court of the United States has identified three circumstances that render administrative remedies unavailable. First, "an administrative procedure is unavailable when . . . it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 643. Second, an

[5] Paragraph 58 of Defendants' statement of undisputed material facts appears to be missing a word. The Court presumes Defendants intended to state that "Olage only submitted a Kite regarding mail he was sending to President Joe Biden and did *not* complete Step 2 or 3 of the grievance process." Doc. 54 ¶ 58; see also Doc. 52 at 2 (stating that "Olage's claim regarding not being able to send his legal mail fails because he . . . did not exhaust his administrative remedies."); Doc. 53 at 10 (providing that "although Olage grieved his inability to send legal mail to President Joe Biden by submitting kites[,] he did not submit an informal resolution request or a request for administrative remedy." (citing Doc. 54 ¶ 58)). Further, to support their motion for summary judgment, Defendants filed an exhibit containing copies of Olage's grievances, kites, informal resolution requests, and requests for administrative remedy, along with the responses. Doc. 54-1. This exhibit does not include a request for administrative remedy regarding mail to President Biden. See generally id.

administrative procedure is unavailable if so confusing that "no ordinary prisoner can discern or navigate it." Id. at 643–44. Finally, an administrative procedure is unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644. Intimidation, according to the Supreme Court, includes threats to "individual inmates so as to prevent their use of otherwise proper procedures." Id.

Olage's assertion that Tammy Doyle's statement that inmates must meet her standard to get a second step grievance is insufficient to establish that the administrative process was not available to him because of her alleged statement. See Doc. 75 ¶ 54. Olage does not allege when Doyle made this statement, and he has not cited to any competent record evidence demonstrating that he requested, but was refused a request for administrative remedy, after Eilers responded to his August 21, 2024 kite. Olage does not allege and has provided no evidence that Doyle or any DOC staff or official took any action that prevented him from filing a request for administrative remedy. Finally, the record demonstrates that Olage submitted thirteen requests for administrative remedy to Doyle after Eilers responded to his kite regarding "legal" mail to then-President Biden, Doc. 54-1 at 89, 99, 104, 112, 117, 121, 125, 133, 137, 148, 163, 171, 177, and eight requests for administrative remedy to Doyle before Eilers responded to his kite, id. at 15, 20, 29, 48, 54, 63, 69, 74.

Eilers, Doyle, and Reyes are entitled to summary judgment on Olage's First Amendment right to send and receive mail and right to petition the government claims against them in their individual capacities for money damages and official capacities for injunctive and declaratory relief. See Swiftbird v. Yantis, No. 19-5008-JLV, 2020 WL 264656, at *4 (D.S.D. Jan. 16, 2020) (recognizing that the PLRA bars prisoners from seeking injunctive or declaratory relief if they

have not exhausted available administrative remedies). These claims are dismissed without prejudice. Barbee v. Corr. Med. Servs., 394 F. App'x 337, 338 (8th Cir. 2010) (per curiam) (holding that once a district court concludes that a prisoner failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997(e)(a), the court is required to dismiss the unexhausted claims without prejudice).

**D. Eighth Amendment Deliberate Indifference to Serious Medical Needs**

To succeed on his deliberate indifference claim, Olage must show that (1) he suffered "an objectively serious medical need[]" and (2) that each "defendant actually knew of, but deliberately disregarded, such need." McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009) (quoting Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir. 2009)). "An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'" Jones v. Minn. Dep't of Corrs., 512 F.3d 478, 481 (8th Cir. 2008) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)).

The second element of deliberate indifference requires a showing that the defendant "deliberately disregarded" the serious medical need, which is a greater burden than showing mere negligence. McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012) (citing Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006)). To satisfy the second element, Olage must demonstrate that the defendant "recognized that a substantial risk of harm existed *and* knew that [his] conduct was inappropriate in light of that risk." Shipp v. Murphy, 9 F.4th 694, 703 (8th Cir. 2021) (quoting Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015)). Olage must show that the defendant's mental state was "akin to criminal recklessness." McCaster, 684 F.3d at 746 (internal quotation omitted). When evaluating whether a defendant displayed deliberate indifference to a plaintiff's

serious medical needs, a court considers the defendant's "actions in light of the information [the defendant] possessed at the time, the practical limitations of [the defendant's] position[,] and alternative courses of action that would have been apparent to an official in that position." Letterman, 789 F.3d at 862 (quoting Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000)). Examples of "[d]eliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." Pietrafeso v. Lawrence Cnty., 452 F.3d 978, 983 (8th Cir. 2006) (quoting Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995)). "[M]ere disagreement with treatment decisions does not rise to the level of a constitutional violation." Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Alberson, 458 F.3d at 765). "Prisoners do not have a constitutional right to any particular type of treatment." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996).

A defendant "may be held personally liable for a constitutional violation only if his own conduct violated a clearly established constitutional right." Baribeau v. City of Minneapolis, 596 F.3d 465, 482 (8th Cir. 2010) (per curiam) (citation omitted). The Eighth Circuit has instructed that "[w]hen there are multiple defendants who played limited roles in the conduct complained of, the determination of whether an individual defendant is entitled to qualified immunity is based upon that defendant's knowledge and conduct at the time or times he or she participated in that conduct." Cannon v. Dehner, 112 F.4th 580, 586 (8th Cir. 2024); see also Jones v. City of St. Louis, 183 F.4th 638, 645 (8th Cir. 2026) ("Qualified immunity thus requires an individualized analysis as to each officer." (citation omitted)). Because deliberate indifference is a subjective inquiry, a district court must "assess each defendant's 'knowledge at the time in question, not by hindsight's perfect vision.'" Cannon, 112 F.4th at 587 (quoting Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011)).

### 1. Knee and Foot Complications

Olage alleges that Wasko, Reyes, Eilers, and Doyle were deliberately indifferent to his knee and foot complaints. Doc. 21 at 25–27, 43. None of these Defendants are medical providers. Doc. 54 ¶¶ 2, 3, 4, 5; Doc. 75 ¶¶ 2, 3, 4, 5. Wasko, Reyes, Eilers, and Doyle contend that they are entitled to summary judgment because Olage's knee pain was treated appropriately, and he did not meet the criteria for medical shoes. Doc. 53 at 12–17. Olage testified that Wasko, Reyes, Eilers, and Doyle are named as defendants regarding his knee complaints and foot pain because he made them aware of his knee complaints through the grievance process, but "nothing got done." Doc. 54-2 at 57–59, 64–66. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). "[A] general responsibility for supervising the operations of a prison is insufficient to establish . . . liability." Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995). Here, giving Olage the benefit of all reasonable inferences, there is evidence to establish that Wasko, Reyes, Eilers, and Doyle were aware through the prison grievance process, that Olage did not believe that he was receiving appropriate medical treatment for his knee complaints and that he was not provided the New Balance shoes that an outside podiatrist had recommended. See, e.g., Doc. 54-1 at 46. But Olage must demonstrate more than that he made Wasko, Reyes, Eilers and Doyle aware of his concerns. He must demonstrate that each Defendant he sues in his or her individual was aware that the medical care that Olage received was constitutionally deficient and acted with deliberate indifference in response to this awareness. On the basis of the undisputed record evidence, Olage fails to make any such showing.

Olage's Eighth Amendment deliberate indifference to serious medical needs claim related to his knee and foot complications against Wasko, Reyes, Eilers, and Doyle in their official capacities for injunctive relief survived screening. Doc. 21 at 25–27, 43. A plaintiff's "official capacity claim for injunctive relief need only allege that each defendant, by virtue of his [or her] office, has some connection with the unconstitutional conduct for which [the plaintiff] seeks injunctive relief." Warfield v. Hettich, No. 4:24-CV-04049-ECS, 2025 WL 957769, at *9 (D.S.D. Mar. 31, 2025) (first alteration in original) (internal quotation omitted) (citing Ex parte Young, 209 U.S. 123, 157 (1908)).

Olage's deposition testimony was that he sustained a knee injury in May 2024 that allegedly was not properly treated. According to Olage's deposition testimony, when he underwent an MRI in early December 2024, the MRI revealed a torn meniscus.[6] Doc. 54-2 at 52–53. Even assuming that there may have been a delay in diagnosing the cause of Olage's knee complaints,[7] the undisputed record evidence demonstrates that Olage was undergoing evaluation and treatment for his knee complaints between May and December 2024. See supra at 10–13. "[I]n cases where some medical care is provided, a plaintiff is entitled to prove his [Eighth Amendment] case by establishing the course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference." Cannon, 112 F.4th at 587 (second alteration in original) (quotation omitted). Here, Olage has not come forward with any

[6] The record does not include a copy of the MRI report nor any provider note summarizing the MRI findings. See generally Doc. 54-3.

[7] It is undisputed that when Olage met with a provider to discuss the results of his MRI, Olage declined the provider's recommendation for a referral to orthopedics for further assessment and treatment options. Doc. 54-3 at 965. Instead, Olage demanded Effexor for pain management and refused to first try conservative pain management alternatives. Doc. 54-3 at 949, 962, 965; Doc. 54 ¶ 148; Doc. 75 ¶ 148. The failure to prescribe Olage's requested course of treatment, as a matter of law, does not violate Olage's Eighth Amendment rights. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997).

competent evidence demonstrating that the treatment he received "so deviated from professional standards that it amounted to deliberate indifference." Id.; see also supra at 10–14.

With respect to Olage's foot pain, it is undisputed that an outside provider recommended New Balance shoes. Doc. 54 ¶ 74; Doc. 54-3 at 327; Doc. 75 ¶ 74. It is also undisputed that Olage was informed that medical cannot buy New Balance shoes, but the shoes can be purchased from commissary.[8] Doc. 54-3 at 365. Olage contends that because an outside provider recommended New Balance shoes, the Eighth Amendment requires that the DOC provide those shoes to Olage. But Olage's position overlooks well established Eighth Amendment precedent. See, e.g., Dulany, 132 F.3d at 1239 (stating that prisoners do not have a constitutional right to receive a particular or requested course of treatment and prison doctors are free to exercise their independent medical judgment). Here, based on the undisputed material facts, Olage has not demonstrated any violation of his Eighth Amendment rights regarding his knee complaints or his request for the New Balance shoes an outside podiatrist recommended. In the absence of any constitutional violation, Olage is not entitled to injunctive or declaratory relief. Falls, 966 F.2d at 380. Accordingly, Wasko, Reyes, Eilers, and Doyle in their official capacities are entitled to summary judgment on Olage's Eighth Amendment deliberate indifference to serious medical needs claim related to his knee and foot complications.

---

[8] In his opposition to Defendants' motion for summary judgment, Olage asserts that "he cannot afford commissary shoes to help his feet and back pain." Doc. 73 ¶ 3. But there is no record evidence that at any time prior to the commencement of this action Olage alleged that he could not afford commissary shoes. Similarly, Olage's amended complaint, Doc. 15, does not include this allegation. Olage "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." Christians v. Young, No. 4:20-CV-04083-LLP, 2024 WL 5694328, at *12 (D.S.D. Sep. 30, 2024) (citations omitted).

### 2. Mental Health Needs

Olage alleges an Eighth Amendment deliberate indifference to serious medical needs claim related to his mental health against Eilers, Nelson, Nixon, Reyes, Wasko, Pirraglia, Doyle, and Carda in their individual capacities for money damages and official capacities for injunctive and declaratory relief. Id. at 27, 43; Doc. 38 at 3. Olage alleges that Eilers, Nelson, Nixon, Reyes, Wasko, and Pirraglia were aware of the risk of harm of changing the administration of his Wellbutrin from 400 mg once a day to 200 mg in the morning and 200 mg in the evening, but decided to have the administration changed without a doctor's order or new treatment plan. Doc. 15 at 15; see also Doc. 15-1 at 24–28, 120. However, the undisputed record evidence directly contradicts this allegation. It is undisputed that on July 26, 2024, a mental health provider changed Olage's Wellbutrin prescription from one 400 mg dose each day to two 200 mg doses per day because it is not recommended to take 400 mg all at once. Doc. 54 ¶ 156; Doc. 54-3 at 477–78; Doc. 75 ¶ 156. The mental health provider who ordered the change is not a named defendant.[9] Although Olage has submitted evidence that after the medication change, he complained to at least some of the Defendants about the change, there is no evidence that any of the Defendants were aware that the medication change posed any risk of serious harm to Olage. See Holden v. Hirner, 663 F.3d at 336, 343 (8th Cir. 2011) (stating that "[p]rison officials lacking medical expertise are entitled to rely on the opinions of medical staff" regarding the proper treatment of a prisoner's health care needs).

Olage also contends that Defendants are indifferent to his serious mental health disorders and ignored his mental health diagnoses for mental health conditions and new disorders that have

---

[9] Nelson is a behavioral health coordinator, and Carda is a mental health counselor. Doc. 54 ¶¶ 6, 7; Doc. 75 ¶¶ 6, 7. But there is no evidence that a behavioral health coordinator or a mental health counselor has authority to prescribe medication.

not been diagnosed. Doc. 15 at 22. Olage asserts that Defendants failed to provide adequate mental health care, psychotherapy treatment and counseling, and did not provide access to a psychiatrist to diagnose and treat various mental health conditions. Id. at 16–17. Once again, however, Olage has not cited any competent record evidence to support the conclusory allegations in his amended complaint. For example, Olage does not identify any record evidence demonstrating that Eilers, Nelson, Nixon, Reyes, Wasko, Pirraglia, Doyle, and Carda were actually aware of and deliberately indifferent to Olage's serious mental health needs. Indeed Olage sees a mental health provider for medication and a mental health professional for therapy. Doc. 54 ¶ 173; Doc. 75 ¶ 173.

Given these undisputed facts, coupled with the complete lack of evidence demonstrating that any of the named Defendants were actually aware of any serious mental health needs that were not being met, Defendants Eilers, Nelson, Nixon, Reyes, Wasko, Pirraglia, Doyle, and Carda are entitled to summary judgment on Olage's individual capacity Eighth Amendment deliberate indifference to serious medical needs claim related to his mental health. These Defendants are also entitled to summary judgment on Olage's official capacity claims because in the absence of any constitutional violation, Olage, as a matter of law, is not entitled to injunctive or declaratory relief. Falls, 966 F.2d at 380.

**E. Fourteenth Amendment Equal Protection**

Olage alleges that he was treated differently than another inmate, Brakeall, who allegedly had a similar knee condition. Doc. 15 at 13. This Court's § 1915A screening order liberally construed Olage's amended complaint to assert a class-of-one equal protection claim. Doc. 21 at 30–32.

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination[.]" Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam) (quotation omitted). Generally, a plaintiff alleging an equal protection violation claims to be a member of an identifiable group that has suffered arbitrary and invidious discrimination. Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601 (2008). A plaintiff, however, may also assert a class-of-one equal protection challenge; such challenges assert that an individual has been "irrationally singled out" for discriminatory treatment. Id. To state a cognizable class-of-one equal protection claim, a plaintiff must allege (1) that the plaintiff was "intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." Olech, 528 U.S. at 564.

The threshold inquiry in a class-of-one equal protection claim is whether the plaintiff is similarly situated to others who have received preferential treatment. Robbins v. Becker, 794 F.3d 988, 996 (8th Cir. 2015) (citation omitted). Absent such a threshold showing, a class-of-one equal protection claim is not viable. Id. (citation omitted). "To be similarly situated for purposes of a class-of-one equal-protection claim, the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects." Id. (internal quotation omitted).

Here, Olage has not come forward with any competent record evidence to establish that Brakeall's knee complaints were identical or directly comparable to him in all material respects. Indeed, the record contains no evidence regarding any specifics of Brakeall's knee complaints, although the amended complaint alleges that he received knee replacement surgery. Doc. 15 at 13. Olage does not contend that he needs knee replacement surgery. According to Olage's

deposition testimony and his response to Defendants' statement of undisputed fact, Olage contends that he has a torn meniscus. Doc. 54-2 at 52; Doc. 75 ¶ 190. Further, it is undisputed, based on the record evidence, that the reason that Olage did not have surgery is because he did not want to undergo surgery while he is in custody, and his father, who is his power of attorney, is the one who would give consent for any surgery Olage were to undergo. Doc. 54 ¶ 196; Doc. 54-2 at 89; Doc. 75 ¶ 196. Olage alleges Brakeall received a knee brace and MRI and claims that he did not, but the record evidence establishes otherwise. See Doc. 54 ¶ 195; Doc. 54-2 at 89; Doc. 75 ¶ 195 (demonstrating that Olage had an MRI performed on his knee at an outside facility). Finally, Olage alleges that Brakeall received some type of refund for charges related to treatment for knee complaints, but there is no record evidence regarding the circumstances surrounding any refund that Brakeall may have received. Thus, this Court cannot determine whether Brakeall's refund situation was identical or substantially similar to the reason that Olage contends that he should receive a refund. Because Olage has not met his burden of demonstrating that Brakeall was similarly situated or treated more favorably under similar circumstances, Defendants Wasko, Reyes, and Eilers are entitled to summary judgment on Olage's Fourteenth Amendment class-of-one equal protection claim.

Even if Olage had demonstrated that Brakeall was "similarly situated," discretionary decision making based on subjective, individualized assessments are not amenable to a class-of-one equal protection claim. Generally, no constitutional claim arises from discretionary decision making. Engquist, 553 U.S. at 603. As the Supreme Court of the United States has explained, when the challenged action necessarily involves discretionary decision making based on subjective, individualized assessment, "the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others,

because treating like individuals differently is an accepted consequence of the discretion granted." Id.

The Eighth Circuit has recognized that a class-of-one theory is a "poor fit" in a context that involves discretionary decision making. Flowers v. City of Minneapolis, 558 F.3d 794, 799–800 (8th Cir. 2009). Decisions regarding the appropriate treatment for a medical condition require judgment and discretion based on individualized and subjective assessments. Thus, a class-of-one equal protection claim is not cognizable based on decisions regarding the appropriate course of treatment for an inmate's knee complaints. See Cartwright v. Krabbenhoft, No. 1:22-CV-025, 2022 WL 2293976, at *3 (D.N.D. May 2, 2022) (concluding that decisions regarding the appropriate course of medical treatment involve discretionary decision making and cannot be a basis for a cognizable class-of-one equal protection claim), report and recommendation adopted by 2022 WL 2291966 (D.N.D. June 24, 2022). Defendants are entitled to summary judgment on Olage's class-of-one equal protection claim for this reason as well.

## V. Conclusion

For the reasons explained above, it is

ORDERED that Defendants' motion for summary judgment, Doc. 52, is granted. It is further

ORDERED that Olage's First Amendment right to send and receive mail and right to petition the government claims against Eilers, Doyle, and Reyes in their individual capacities for money damages and official capacities for injunctive and declaratory relief are dismissed without prejudice. It is finally

ORDERED that Olage's remaining claims listed on pages 2 and 3 above are dismissed

with prejudice.

DATED September 11th, 2026.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE